Opinión de conformidad emitida por la
Juez Asociada Señora Rodríguez Rodríguez.
Estoy conforme con el resultado al que llega hoy una mayoría de este Tribunal al concluir que la Ley de Mandato Constitucional de Rehabilitación de 2004, Ley Núm. 377 de 16 de septiembre de 2004, 4 L.P.R.A. see. 1611 et seq. (Ley de Rehabilitación), tuvo el efecto de enmendar tácitamente el Artículo 62 del Código Penal de 1974 (Código de 1974), 33 L.P.R.A. see. 3302 (ed. 2001), el cual prescribía que toda persona condenada como reincidente habitual debía ser sentenciada a la pena de separación permanente de la sociedad mediante reclusión en una ins-titución especializada de custodia máxima durante la tota-lidad del término impuesto. Sin embargo, escribo por sepa-rado por entender que es necesario que expresemos las razones por las que la Ley de Rehabilitación es de aplica-ción al caso de autos.
I
Los hechos que dan origen a la controversia ante nues-tra consideración no están en disputa. El Sr. Jacinto López Borges fue hallado culpable de violar el Artículo 173 del Código Penal de 1974 (robo), 3 L.P.R.A. see. 4279 (ed. 2001), y el Artículo 4 de la Ley de Armas de 1951, 5 L.P.R.A. see. 414 (ed. 1999). El 4 de junio de 1991, la Sala de San Juan del Tribunal de Primera Instancia lo declaró delincuente habitual y, como tal, lo sentenció a la separa- *617 ción permanente de la sociedad mediante reclusión perpe-tua en una institución especializada de custodia máxima, obedeciendo el mandato inequívoco establecido en el inciso (c) del Artículo 62 del entonces vigente Código de 1974.
Durante su tiempo en prisión, ha recibido tratamiento contra la adicción, terminó el cuarto año de escuela superior y ha trabajado en el área de empaque. No se han pre-sentado querellas ni celebrado vistas disciplinarias en su contra.
El 10 de diciembre de 2008, el Comité de Clasificación y Tratamiento del Anexo 296 de Guayama (el Comité) evaluó la custodia del señor López y, como en múltiples ocasiones anteriores, ratificó su clasificación de custodia como máxima. Inconforme con dicha determinación, el confinado presentó una apelación administrativa ante la Supervisora de la Oficina de Clasificación, la cual fue denegada el 19 de diciembre del mismo año según el fundamento siguiente:
[E]l Código Penal del Estado Libre Asociado de Puerto Rico de 1974, Artículo 62 (Efectos de Reincidencia), Ley 115 del 22 de julio de 1974, según enmendada por la Ley Núm. 101 del 4 de jimio de 1980, Ley 34 del 31 de mayo de 1988 y la Ley Núm. 32 del 27 de julio de 1993, establece que un convicto delincuente habitual sentenciado a reclusión perpetua, deberá cumplir todo su término de reclusión en institución especializada de máxima seguridad. Apéndice de la Petición de certiorari, pág. 96.
Aún inconforme, el señor López Borges acudió oportu-namente al Tribunal de Apelaciones. Allí planteó que, a partir de la entrada en vigor de la Ley de Rehabilitación, la Administración de Corrección ya no estaba obligada a mantener en custodia máxima a las personas sentenciadas a separación permanente de la sociedad por haber sido de-claradas reincidentes habituales.
Por su parte, la Administración de Corrección compare-ció ante el foro apelativo intermedio, mas no se expresó en torno a la alegación presentada por el señor López Borges. En cambio, sostuvo que, por virtud de la cláusula de re- *618 serva adoptada mediante el Artículo 308 del Código de 2004 (33 L.P.R.A. see. 4935), la Administración de Corrección seguía obligada a mantener bajo custodia máxima a toda persona sentenciada como reincidente habitual al amparo del Código de 1974. Además, adujo que, conforme a lo resuelto por este Tribunal en Cruz v. Administración, 164 D.P.R. 341 (2005),([1]) al momento de evaluar la clasificación de custodia del confinado, la Administración de Corrección no tomó como único factor concluyente la longevidad de la sentencia impuesta, sino que también consideró que el con-finado había sido declarado delincuente habitual y los da-ños cometidos por éste.
El 14 de mayo de 2010, un panel dividido del Tribunal Apelaciones resolvió que la Ley de Rehabilitación aplicaba a todos los confinados, incluso a aquellos que fueron condenados antes de la aprobación del estatuto. ([2]) Concluyó que la ley bajo análisis era clara y que no disponía excepciqón alguna al mecanismo de revaluación de custodia de los confinados. Por lo tanto, devolvió el caso al Comité para que revaluara el nivel de custodia al que era acreedor el señor López sin tomar en consideración la prohibición impuesta por el Artículo 62(c) del Código de 1974, 33 L.P.R.A. sec. 3302(c) (ed. 2001).
El 12 de julio de 2010, la Administración de Corrección presentó ante este Tribunal un recurso de certiorari, el cual acogimos el 12 de enero de 2011. En este recurso plan-tea que el Tribunal de Apelaciones erró al aplicar la Ley de Rehabilitación a una persona declarada reincidente habitual al amparo del Código de 1974. Sostiene, entre otras cosas, que el foro apelativo intermedio aplicó errónea- *619 mente el principio de favorabilidad que recoge el Artículo 9 del Código de 2004, 33 L.P.R.A. see. 4637. No le asiste la razón. Veamos por qué.
II
A
La Sección 19 del Artículo VI de la Constitución del Es-tado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, dis-pone que será política pública del Estado reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponi-bles, al tratamiento adecuado de los delincuentes para ha-cer posible su rehabilitación moral y social.
En cumplimiento con este mandato constitucional, la Ley Orgánica de la Administración de Corrección, Ley Núm. 116 de 22 de julio de 1974, según enmendada, 4 L.P.R.A. sec. 1101 et seq., facultó a dicho organismo admi-nistrativo para estructurar su política pública y para for-mular la reglamentación interna para los programas de diagnóstico, clasificación, tratamiento y rehabilitación de la población correccional. Véanse: 4 L.P.R.A. see. 1112; López Leyro v. E.L.A., 173 D.P.R. 15 (2008); Cruz v. Administración, supra. De esta forma, se le delegó a la Administración de Corrección la facultad de clasificar el nivel de custodia de los confinados de las instituciones correcciona-les del País.
En atención a esta facultad, la Administración de Co-rrección ha adoptado diversos reglamentos: el Manual de Reglas para Crear y Definir Funciones del Comité de Cla-sificación y Tratamiento en las Instituciones Penales, Re-glamento Núm. 2485 de 8 de marzo de de 1979 (Reglamen-to de 1979); el Manual de Clasificación de Confinados, Reglamento Núm. 6067 de 22 de enero de 2000 (Reglamen-to de 2000); el Manual para Crear y Definir Funciones del Comité de Clasificación y Tratamiento de las Instituciones *620 Correccionales, Reglamento Núm. 7334 de 10 de abril de 2007 (Reglamento de 2007).([3]) Estos reglamentos delimitan la discreción que posee la Administración de Corrección en relación con la clasificación de custodia de los confinados. Véase Cruz v. Administración, supra.
El Comité de Clasificación y Tratamiento en las Institu-ciones Penales fue creado por virtud del Reglamento de 1979. Su función básica es evaluar las necesidades, capa-cidades, intereses, limitaciones y funcionamiento social de los confinados; establecer un plan de tratamiento, el cual deberá ser evaluado periódicamente, y realizar aquellos cambios necesarios para el logro de las metas rehabilitado-ras y de protección social. Conforme a la Regla 6(b)(2)(a) del precitado Reglamento, los cambios de custodia caen bajo la jurisdicción de este Comité.
Por otra parte, el Reglamento de 2000 dispone, en su sección sobre Perspectiva General, que la clasificación de confinados es la médula de una administración eficiente y eficaz del sistema correccional. López Leyro v. E.L.A., supra. La clasificación de los confinados en distintos niveles de seguridad consiste en la separación sistemática y evolutiva de los confinados en subgrupos, en virtud de las necesidades de cada individuo y las exigencias y necesidades de la sociedad. El proceso comienza desde la fecha de ingreso del confinado hasta la fecha de su excarcelación. De esta forma, además de satisfacer las necesidades del confinado, el proceso de clasificación también coordina la custodia física de los confinados con los programas y recur-sos disponibles dentro del sistema correccional. Por último, el proceso responde a principios de protección social, dado *621 que los confinados más peligrosos se mantienen bajo ma-yores controles de seguridad. íd.
La determinación del nivel de custodia de un confinado requiere que la agencia realice un adecuado balance de intereses. En Cruz v. Administración, supra, este Tribunal describió ese balance de la manera siguiente:
Por una parte, estará el interés público de lograr la rehabili-tación del confinado, así como el de mantener la seguridad institucional y general del resto de la población penal; de la otra, estará el interés particular del confinado de permanecer en un determinado nivel de custodia. íd., pág. 352.
Conforme a estos principios, los acuerdos del Comité de Clasificación y Tratamiento deberán estar fundamentados por hechos e información sometida ante su consideración, mediante la cual se evidencie la necesidad de la acción re-comendada o aprobada. Regla 3 del Reglamento de 2007, pág. 8. Sus decisiones incluirán determinaciones de hechos y conclusiones de derecho, especialmente en aquellos casos en que se evalúe el nivel de custodia de confinados bajo custodia mediana o máxima, ya sea para subirla o ratificarla. íd. La jurisdicción del Comité incluye, entre otros aspectos, la administración de tipo de custodia, alo-jamientos, trabajo, estudios o adiestramientos vocacional y tratamientos de condiciones especializadas. Regla 4(A) del Reglamento de 2007, pág. 9.
“El Comité revisará anualmente los niveles de custodia para los confinados de custodia mínima y mediana”. Sec-ción 2(V)(D) del Reglamento de 2000, pág. 20. El nivel de custodia de los confinados clasificados en custodia máxima se revisará cada seis meses, después de un año de clasifi-cación como confinado de custodia máxima.
No obstante, la revaluación de custodia no necesaria-mente tendrá como resultado un cambio en la clasificación de custodia o en la vivienda asignada. Sección 7(11) del Reglamento de 2000, pág. 42. La función principal de la revaluación de custodia es supervisar la adaptación del *622 confinado y prestarle atención a cualquier situación perti-nente que pueda surgir, así como evaluar la conducta real del confinado durante su reclusión.
Las revisiones de clasificación pueden ser de tres tipos: (1) revisiones de rutina, (2) revisiones automáticas no ru-tinarias y (3) solicitudes de reclasificación presentadas por los confinados. Sección 7(III)(B) del Reglamento de 2000, págs. 43-44.
B
El Código Penal de 1974, Ley Núm. 115 de 22 de julio de 1974, al igual que el Código vigente, establecía tres tipos de reincidencia para las personas condenadas en más de una ocasión: reincidencia simple, reincidencia agravada y reincidencia habitual.
El inciso (a)(3) del Artículo 61 de dicho Código, 33 L.P.R.A. see. 3301 (ed. 2001), leía de la manera siguiente:
Habrá reincidencia habitual cuando el que ha sido convicto y sentenciado por dos o más delitos graves cometidos en tiem-pos diversos e independientes unos de otros cometiere poste-riormente cualquiera de los siguientes delitos o sus tentativas: asesinato, robo, incesto, extorsión, violación, sodomía, actos lascivos o impúdicos cuando la víctima fuere menor de catorce (14) años, secuestro, agresión agravada en su modalidad grave, escalamiento agravado, apropiación ilegal agravada de vehículos de motor o sus partes, incendio agravado, sabotaje de servicios públicos esenciales, fuga cuando la persona esté cumpliendo una sentencia firme o en trámite de apelación por un delito grave, cualquier delito grave en violación a la [Ley de Explosivos de Puerto Rico, Ley Núm. 134 de 28 de junio de 1969], y a la Ley Contra el Crimen Organizado, [Ley Núm. 33 de 13 de junio de 1978, 25 L.P.R.A. see. 971 et seq., violación a los artículos 401, 405 y 411(a)] de la Ley de Sustancias Con-troladas de Puerto Rico, [Ley Núm. 4 de 23 de junio de 1971, o a los artículos 5 y 8(a) de la Ley de Armas de Puerto Rico, Ley Núm. 17 de 19 de enero de 1951, según enmendada,] así como también cualquier conspiración por la comisión de estos deli-tos y sus tentativas.
Por su parte, el Artículo 62 del mismo cuerpo legal, 33 *623 L.P.R.A. see. 3302 (ed. 2001), disponía lo siguiente sobre los efectos de la reincidencia habitual:
En caso de reincidencia habitual el convicto será declarado por el tribunal delincuente habitual y será sentenciado a se-paración permanente de la sociedad mediante reclusión perpetua. No obstante lo dispuesto [en la Ley Núm. 116 de 22 de julio de 1974, según enmendada,] en cuanto a la facultad de la Administración de Corrección para determinar las institu-ciones en que habrá de ser ingresada o trasladada la clientela del sistema correccional, el convicto que sea sentenciado a se-paración permanente cumplirá todo el término de reclusión en una institución especializada de máxima custodia y la Admi-nistración de Corrección proveerá a este tipo de delincuente todos los servicios y programas en la propia institución, inclu-yendo aquellos que propendan a su rehabilitación. (Enfasis suplido).
Como surge de las disposiciones citadas, a partir de las enmiendas realizadas al Artículo 62 del Código de 1974 mediante la Ley Núm. 34 de 31 de mayo de 1988, los con-victos declarados reincidentes habituales y, por lo tanto, sentenciados a separación permanente de la sociedad, te-nían que ser ingresados o trasladados a una institución especializada de máxima custodia durante todo el término de su sentencia.
No obstante, el Código de 1974 fue derogado por la Ley Núm. 149 de 18 de junio de 2004, según enmendada, cono-cida como el Código Penal del Estado Libre Asociado de Puerto Rico, 33 L.P.R.A. see. 4629 et seq. En este Código, la figura del delincuente habitual se encuentra regulada por el inciso (c) del Artículo 81:
Habrá reincidencia habitual cuando el que ha sido convicto y sentenciado por dos o más delitos graves, cometidos y juzga-dos en tiempos diversos e independientes unos de otros, co-meta posteriormente un delito grave de primer grado o un delito grave de segundo grado o cualquier delito grave en vio-lación a la Ley de Explosivos de Puerto Rico, [Ley Núm. 134 de 28 de junio de 1969] y la Ley Contra el Crimen Organizado, [Ley Núm. 33 de 13 de junio de 1978], violación a los [Artículos 401, 405, 411 y 411(a) ] de la Ley de Sustancias Controladas de *624 Puerto Rico, [Ley Núm. 4 de 23 de junio de 1971] o a los Artí-culos 2.14, 5.03 y 5.07 de la Ley de Armas de Puerto Rico, según enmendadas. La pena a aplicar será de noventa y nueve (99) años. 33 L.P.R.A. see. 4709.
Claramente, tras la entrada en vigor de Código de 2004, la Administración de Corrección ya no está obligada a mantener en una institución especializada de máxima cus-todia, durante todo el término de reclusión, al convicto sen-tenciado a separación permanente bajo dicho estatuto.
A pesar de este cambio, aquella conducta incurrida du-rante la vigencia del Código de 1974 se regirá por las dis-posiciones de dicho cuerpo legal o por las leyes vigentes al momento en que ocurra el hecho. Así lo establece el Artí-culo 308 del Código de 2004, en lo que la jurisprudencia ha venido a conocer como la cláusula de reserva:
La conducta realizada con anterioridad a la vigencia de este Código en violación a las disposiciones del Código Penal aquí derogado o de cualquier otra ley especial de carácter penal se regirá por las leyes vigentes al momento del hecho.
Si este Código suprime algún delito no deberá iniciarse el encausamiento, las acciones en trámite deberán sobreseerse, y las sentencias condenatorias deberán declararse nulas y liberar a la persona. El cambio de nombre de un delito no significa que el tipo delictivo ha quedado suprimido. Id. Véanse: Pueblo v. Padín Rodríguez, 169 D.P.R. 521 (2006); Pueblo v. González, 165 D.P.R. 675 (2005).
C
El 16 de septiembre de 2004, la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 377, mejor conocida como la Ley de Mandato Constitucional de Rehabilitación. Esta ley convirtió en mandato la aspiración contenida en la Sec-ción 19 del Artículo VI de nuestra Constitución de propen-der al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social.
La Exposición de Motivos de la Ley de Rehabilitación *625 denota claramente la preocupación de nuestros legislado-res al redactar la pieza legislativa:
Ante el auge de la acción delictiva y la creciente manifesta-ción de conducta violenta en jóvenes y adultos, desde hace años se ha reclamado examinar la política pública y la acción del Gobierno en materia correccional. Estudios recientes, re-comendaciones de Comisiones Especiales, datos empíricos y el juicio de peritos en sociología y criminología han planteado la necesidad urgente de transformar la política correccional como componente fundamental de un sistema de justicia criminal que también ha fracasado estrepitosamente.
No puede soslayarse por más tiempo que las estrategias im-plantadas en Puerto Rico desde el 1974 hasta el presente, en lugar de prevenir o reprimir la comisión de delitos, parecen reproducir o fomentar la criminalidad. Existe consenso en el reconocimiento de la complejidad del problema pero se reco-mienda consistentemente que se evalúen los programas de re-habilitación de sentenciados y el sistema penal en general para proveer alternativas que aminoren la conducta violenta y delictiva desde fases tempranas. Exposición de Motivos de la Ley Núm. 377 de 16 de septiembre 2004 (2004 (Parte 2) Leyes de Puerto Rico 2549-2550).
Como datos que corroboran la necesidad de cambio y transformación, la Asamblea Legislativa reconoció, entre otros, los hechos siguientes: que los estudios sobre la rea-lidad puertorriqueña demuestran que la mayor parte de la población encarcelada cumple por delitos que no son de violencia y que, actualmente, la prisión como pena no con-tribuye en los procesos de reintegración del individuo a la sociedad ni a su rehabilitación; que la reincidencia en la actividad de los egresados de las instituciones carcelarias y de los programas comunitarios vigentes indican el fracaso de la prisión como institución que busca la rehabilitación, y que para prevenir la reincidencia es necesario ampliar los programas dirigidos a preparar al sentenciado para su reinserción a la sociedad y hacerlos disponibles “a toda la población penal”.
Para atender estas preocupaciones, el Artículo 3 de la Ley de Rehabilitación, 4 L.P.R.A. see. 1611, establece que:
*626 A partir de la vigencia de esta ley, las agencias gubernamen-tales, principalmente, entiéndase, el Departamento de Correc-ción y Rehabilitación, la Administración de Corrección, la Ad-ministración de Instituciones Juveniles, la Corporación de Empresas de Adiestramiento y Trabajo y la Junta de Libertad bajo Palabra, así como las concernidas organizaciones comu-nitarias que voluntariamente participen en este esfuerzo, pon-drán en ejecución programas de rehabilitación que impacten “a toda la población sentenciada”, incluidos los adultos y me-nores transgresores, que necesiten estos servicios.
Para cumplir la obligación impuesta en este capítulo, el sis-tema de rehabilitación a la población sentenciada, tanto adul-tos como menores transgresores, habrá de satisfacer los si-guientes requisitos y exigencias, e incluirá las siguientes características:
(a) Clasificación adecuada de la población correccional y re-visión continua de esta clasificación conforme a los ajustes y cambios de la clientela. ...
(b) Integración y participación activa de la población correc-cional, sus familiares, el personal correccional y las víctimas en el diseño, implantación y evaluación periódica de los siste-mas de clasificación y los programas de rehabilitación.
(c) Incorporación y ampliación de los programas de salud correccional y salud mental a tal grado que estén disponibles para toda la población penal .... (Enfasis suplido).
D
La Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, 3 L.P.R.A. see. 2101 et seq., y su jurisprudencia interpretativa nos obligan a exa-minar toda determinación administrativa con cierto grado de deferencia. Esta norma va unida a una presunción de legalidad y corrección que debe respetarse mientras no se pruebe convincentemente lo contrario. Rivera Concepción v. A.R.Pe., 152 D.P.R. 116 (2000); Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425 (1997). Por lo tanto, la revisión judicial es limitada. Sólo procede cuando la agencia actúa arbitrariamente o de manera tan irrazonable que el acto resulta un abuso de su discreción. El propósito de-trás de la norma prudencial es “evitar la sustitución del criterio del organismo administrativo en materia especia- *627 lizada por el criterio del tribunal revisor”. Reyes Salcedo v. Policía de P.R., 143 D.P.R. 85, 95 (1997).
No obstante, el tribunal podrá revisar las conclusiones de derecho de la agencia en todos sus aspectos, sin sujeción a norma o criterio alguno. 3 L.P.R.A. see. 2175; O.E.G. v. Román, 159 D.P.R. 401 (2003); P.R.T.C. v. J. Reg. Tel. de P.R., 151 D.P.R. 269 (2000). Aun así, el tribunal revisor no debe descartar libremente las interpretaciones o conclusiones de la agencia administrativa, sino que deberá dar deferencia en la medida en que éstas sean razonables. Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 132 (1998). Por lo tanto, el tribunal sostendrá las conclusiones mientras sean cónsonas con el propósito legislativo y no sean arbitrarias, ilegales o irrazonables. T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 80 (1999).
III
Luego de evaluar detenidamente el derecho aplicable a la situación fáctica ante nuestra consideración, estoy con-vencida de que la Ley de Rehabilitación dejó sin efecto la prohibición establecida en el Artículo 62 del Código de 1974, por lo cual el señor López Borges era acreedor a que el Comité de Clasificación revaluara su clasificación y aus-cultara la posibilidad de reducir su nivel de custodia a una más baja de entender el Comité que el confinado cumplía con los demás requisitos reglamentarios aplicables.
A
La Administración de Corrección plantea que el Tribunal de Apelaciones aplicó erróneamente el Artículo 81 del Código de 2004, el cual le resulta más benigno, a hechos ocurridos bajo la vigencia del Código de 1974, en violación a la cláusula de reserva recogida en el Artículo 308 del Código actual. No tiene razón.
*628 Como señala la profesora Dora Nevares, el propósito de la cláusula de reserva del Artículo 308 es que “la conducta realizada con anterioridad a la vigencia del nuevo y vigente Código en violación a alguna disposición del Código Penal derogado, o cualquier otra ley especial de carácter penal, se regirá por las leyes vigentes al momento del hecho,” con la “sola excepción, contemplada en el segundo párrafo del [mencionado Artículo 308], la cual establece que si el Código suprime algún delito no se deberá encausar a la persona por ese delito y que cualquier acción en trámite debe sobreseerse”. D. Nevares-Muñiz, Nuevo Có-digo Penal de Puerto Rico, Ed. 2004-2005, San Juan, Inst. para el Desarrollo del Derecho, 2004, pág. 389.
Esta cláusula sencillamente impide que una persona acusada al amparo del Código de 1974 invoque el principio de favorabilidad recogido en el Artículo 9 actual, para be-neficiarse de las penas más benignas establecidas en un Artículo del Código Penal de 2004. Véanse: Pueblo v. Negrón Rivera, 183 D.P.R. 271 (2011); Pueblo v. Padín Rodríguez, supra; Pueblo v. González, supra. Mas eso no fue lo que sucedió en el caso ante nuestra consideración. La Ley de Rehabilitación es una ley especial de carácter penal, con implicaciones procesales y sustantivas de índole constitucional, a la cual no le aplica la cláusula de reserva del Artículo 308. No se trata de una mera disposición del Có-digo de 2004. La medida fue aprobada por la Asamblea Legislativa el 16 de septiembre de 2004 y entró en vigor inmediatamente después de su aprobación; por lo tanto, a pesar de que esta ley se aprobó aproximadamente tres me-ses después del Código de 2004, entró en vigor aproxima-damente ocho meses antes que éste. Además, las disposi-ciones del nuevo Código no contravinieron en absoluto el mandato recogido en la Ley de Rehabilitación, sino todo lo contrario: lo complementaron.
*629 Por lo tanto, procede la aplicación de la Ley de Mandato Constitucional de Rehabilitación al caso de autos. Se trata de una ley especial posterior al Código de 1974, que, ade-más de haber sido aprobada luego del Código de 2004, no fue contravenida por la entrada en vigor de este cuerpo legal de carácter general.
B
La Exposición de Motivos de la Ley de Rehabilitación es clara en cuanto a la voluntad legislativa de “ampliar los programas dirigidos a preparar al sentenciado para su reinserción a la sociedad y hacerlos disponibles a toda la población penal”. (Enfasis suplido). Asimismo, su Artículo 3 utiliza un lenguaje diáfano y absoluto: “A partir de la vigencia de esta ley ... la Administración de Corrección ... pondrá en ejecución programas de rehabilitación que im-pacten a toda la población sentenciada”. (Enfasis suplido). Más adelante, añade que “[p]ara cumplir la obligación im-puesta en este capítulo, el sistema de rehabilitación a la población sentenciada ... habrá de satisfacer los siguientes requisitos y exigencias, e incluirá las siguientes caracterís-ticas: (a) Clasificación adecuada de la población correccio-nal y revisión continua de esta clasificación .... (b) Integra-ción y participación activa de la población correccional, sus familiares, el personal correccional y las víctimas en el diseño, implantación y evaluación periódica de los sistemas de clasificación y los programas de rehabilitación. (C) In-corporación y ampliación de los programas de salud correc-cional y salud mental a tal grado que estén disponibles para toda la población penal”. Id. Tras una lectura simple del artículo precitado, es evidente que la intención legisla-tiva era que los nuevos mecanismos de clasificación y los programas de rehabilitación fueran aplicables a toda la po-blación correccional, sin distinción alguna.
*630 c
No obstante reconocer que la Ley de Rehabilitación ex-tiende su aplicación a todos los confinados, la opinión disi-dente concluye, basándose en el Reglamento de 2000, que ello “no necesariamente conlleva una reducción en el nivel de seguridad en que se custodia al evaluado”. (Enfasis suplido). Opinión disidente, pág. 643. También reconoce que “[l]a reclasificación es parte del proceso de rehabilita-ción” y que “[s]i bien es cierto que una fase de la reclasifi-cación va dirigida a analizar el nivel de custodia en que debe estar el confinado, eso no es el único propósito de este proceso”. Id.
La disidencia tiene razón al expresar que cambiar el nivel de custodia de un confinado no es el fin único del proceso de reclasificación; pero puede ser uno de ellos. El hecho de que la revaluación de la clasificación de un confi-nado no necesariamente implique una reducción del nivel de custodia, significa, lógica e indubitadamente, que, en algunas ocasiones, sí podría resultar en un cambio al nivel de custodia asignado originalmente. Por lo tanto, no proce-día que el Comité de Clasificación rechazara la solicitud del señor López Borges meramente por éste haber sido de-clarado reincidente habitual. La ley no dispone tal excepción. Después de todo, el delincuente habitual, como todo confinado, también es parte de “toda la población correccional”.
Los fundamentos en que se sostiene la opinión disidente no son convincentes jurídicamente. Un análisis lógico-deductivo refleja el error subyacente. Por un lado, reconoce que la Ley de Rehabilitación aplica a todos los confinados sin distinción alguna. Opinión disidente, pág. 643. Reco-noce, además, que la reclasificación es parte del proceso de rehabilitación. Id. Finalmente, admite que una fase de la reclasificación va dirigida a analizar el nivel de custodia en que debe estar el confinado. Id., pág. 644. No obstante, *631 resuelve que, en este caso, el confinado tiene derecho a beneficiarse de los programas de rehabilitación e incluso de los procesos de reclasificación establecidos como parte de la Ley de Rehabilitación, mas no puede gozar de una de las fases más importantes de dicho proceso: el cambio en su nivel de custodia. Nuevamente, la ley no crea tal excepción.
La disidencia se ampara incorrectamente en definicio-nes recogidas en el Reglamento de 2000. Según la opinión de la minoría, “el Manual de Clasificación [Reglamento de 2000] hace un reconocimiento expreso de los efectos de la reincidencia habitual sobre las condiciones en que el confi-nado debe extinguir su pena. Reitera que debe cumplirla en una institución de seguridad máxima”. Opinión disi-dente, pág. 644. Evidentemente, dicho Manual, promul-gado cuatro años antes que la Ley de Rehabilitación, no podía decir otra cosa pues debía cumplir con la prohibición del Artículo 62 del Código de 1974. Pero dicha prohibición quedó sin efecto tras la aprobación de ley en cuestión. Ade-más, incluso si dicho lenguaje quedara intacto en regla-mentos ulteriores, ninguna agencia administrativa está fa-cultada para aprobar disposiciones reglamentarias que contravengan la voluntad legislativa plasmada en leyes. Por lo tanto, la Administración de Corrección no podría, mediante reglamento, limitar lo que la Asamblea Legisla-tiva amplió mediante ley.
Los disidentes yerran también al expresarse sobre el Artículo 7 de la Ley de Rehabilitación, 4 L.P.R.A. see. 1615, para fortalecer su argumento. Esta disposición no tiene nada que ver con la controversia ante nuestra consideración. Este artículo establece el procedimiento de certificación de rehabilitación mediante el cual el Secreta-rio del Departamento de Corrección y Rehabilitación podrá emitir un certificado de rehabilitación con la consecuencia de dar por cumplido el resto de la pena privativa de la libertad de un confinado, luego de que el tribunal que dictó *632 sentencia evalúe el asunto. En este caso, el señor López Borge no solicita la emisión de este certificado de rehabilitación. Está solicitando, únicamente, que, como parte de su evaluación de clasificación, se ausculte la posi-bilidad de reducir su nivel de custodia.
Además, a pesar de que la redacción original del Artí-culo 7 disponía inexpugnablemente que el tribunal que dictó sentencia podía dar por cumplida la sentencia de “cualquier persona convicta por delito grave, incluyendo a los sentenciados con anterioridad a la vigencia de este Ley”, los disidentes se cobijan nuevamente en una disposición reglamentaria (esta vez del Reglamento de 2007) para sos-tener que “[e]l hecho de que una sentencia por delincuencia habitual implique la comisión, no de uno, sino de varios delitos graves cometidos en diferentes instancias, lo ex-cluye del manto del beneficio”. Opinión disidente, págs. 644-645. En primer lugar, el precitado artículo expresaba rotundamente que el beneficio estaría disponible para todo sentenciado por delito grave. No hacía ninguna excepción para reincidentes habituales. En segundo lugar, los disi-dentes concluyen que el sentenciado debía cumplir con las normas del Código Penal y los reglamentos pertinentes para aprovechar este beneficio. Tienen razón. Sin embargo, en este caso, la Ley de Rehabilitación se imponía sobre el Código de 1974 y ningún reglamento administrativo, anterior o posterior, podía primar sobre ella.
Como si fuera poco, la opinión disidente omite discutir un asunto clave: que el Artículo 7 de la Ley de Rehabilita-ción fue enmendado por la Ley Núm. 165 de 16 de diciem-bre de 2009. Esta ley ciertamente limitó el alcance de la Ley de Rehabilitación; pero sólo respecto a la concesión de certificados de rehabilitación por parte del Secretario del Departamento de Corrección y Rehabilitación. Por ello, la Asamblea Legislativa decidió eliminar del Artículo 7 la cláusula que facultaba al tribunal sentenciador a dar por cumplida la sentencia de aquellos confinados “sentencia- *633 dos con anterioridad a la vigencia de esta Ley”. Todo lo demás quedó inalterado. La Asamblea Legislativa inter-pretó correctamente que la medida legislativa aprobada en 2004, en su totalidad, tenía un efecto tan abarcador y ex-tensivo, que había que limitar mediante legislación un as-pecto particular de su aplicación. Por ende, mientras que aquella Rama tuvo que legislar para que el beneficio del certificado de rehabilitación no aplicara retroactivamente, los jueces disidentes resolverían hoy que no hay problema con que aplique retroactivamente, pero no a delincuentes habituales.
La realidad es que, según el estado de derecho vigente, el señor López Borges no tiene derecho a que su sentencia se dé por cumplida por un tribunal tras la emisión de un certificado de rehabilitación por parte del Secretario del Departamento de Corrección. Sin embargo, esto se debe al momento en que el confinado fue sentenciado y no a que haya sido declarado reincidente habitual.
Por supuesto, nada de lo dispuesto anteriormente al-tera, en lo más mínimo, el resultado al que debemos llegar el día de hoy, pues los fundamentos aplicables al caso ante nuestra consideración no se encuentran en el Artículo 7 de la Ley de Rehabilitación, sino en partes de su exposición de motivos y del Artículo 3, donde se recoge repetidamente la intención de aplicar los programas de rehabilitación y los procesos de reclasificación a toda la población correccional. Ninguna de esas disposiciones fue eliminada. Por lo tanto, lejos de menoscabar el resultado expresado, la enmienda producida en 2009 reafirma el alcance abarcador del resto de la Ley de Rehabilitación.
En fin, la resolución emitida por la Supervisora de la Oficina de Clasificación, cuya revisión se solicitó ante el Tribunal de Apelaciones, estableció como fundamento para su determinación la prohibición contenida en el Artículo 62 del Código de 1974. Por lo tanto, erró en su conclusión de derecho en torno a que estaba impedida de revisar el nivel *634 de custodia asignado al señor López Borges por éste haber sido declarado reincidente habitual y sentenciado a la se-paración permanente de la sociedad mediante la reclusión en una institución especializada de custodia máxima. Por tal razón, procede confirmar la determinación del Tribunal de Apelaciones que devolvió el caso al Comité de Clasifica-ción para que éste evalúe, sin impedimento del Artículo 62 del Código de 1974, si el señor López Borges cumple con los demás requisitos reglamentarios para ser reclasificado en un nivel de custodia menor al actual.
IV
Por entender que los mecanismos de rehabilitación y reclasificación de custodia plasmados en la Ley de Man-dato Constitucional de Rehabilitación de 2004 son aplica-bles a toda la población correccional, independientemente de que el confinado haya sido declarado reincidente habitual al amparo del Código Penal de 1974, estoy conforme con la opinión del Tribunal.
— O —

(1) Tal y como hiciera el Tribunal de Apelaciones, advertimos que en Cruz v. Administración, 164 D.P.R. 341 (2005), no estuvo en controversia el alcance de la Ley del Mandato Constitucional de Rehabilitación en cuanto a los criterios aplicables a la reclasificación de custodia de sentenciados a separación permanente en razón de haber sido declarados delincuentes habituales, ni la aplicabilidad del Artículo 62(c) del derogado Código Penal de 1974, 33 L.P.R.A. sec. 3302(c) (ed. 2001), a dichos procesos.

(2) El juez Escribano Medina emitió el voto disidente.

(3) Aunque la Administración de Corrección ha aprobado dos manuales de cla-sificación luego del Reglamento de 2000, ninguno está vigente actualmente. El Re-glamento Núm. 7062 de 30 de noviembre de 2005 y el Reglamento Núm. 7295 de 14 de febrero de 2007 se encuentran inactivos tras una orden del Tribunal de Distrito Federal para el Distrito de Puerto Rico en el caso Morales Feliciano v. Fortuno Bur-set, Civil No. 79-0004. Por su parte, el Reglamento de 2007 dejó sin efecto el promul-gado en 1979.